

Colin Prince
Chief Appellate Attorney
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for Peter Yeager

# United States District Court
Honorable Wm. Fremming Nielsen

| | |
|---|---|
| United States, | No. 21-cr-1-WFN |
| Plaintiff, | Civil Commitment Memorandum |
| v. | |
| Peter Yeager, | |
| Defendant. | Noted: March 20, 2024, 9 a.m. |

# I.   Introduction

Pete Yeager respectfully submits this memorandum to outline the law and facts before the civil commitment hearing.

# II.   Law

Imprisoning a person due to mental illness is no small matter and strictly limited in time. A person may be civilly committed "only as long as he is *both* mentally ill and dangerous"—due process allows not a minute more. *See U.S. v. Wattleton*, 296 F.3d 1184, 1199 (11th Cir. 2002) (citation omitted) (emphasis added).[1] At the hearing, Mr. Yeager carries the burden to show by clear and convincing evidence that his release wouldn't create a "substantial risk" of bodily injury or serious damage of property due to a present mental disease or defect. 18 U.S.C. § 4243(d).

The word "substantial" is important. In using that term, Congress recognized that releasing *any* insanity acquittee will always carry some risk—the person committed a federal crime, after all. But the law does not (and cannot) require certainty. It requires common sense. And only those persons who present a "substantial risk" may be committed.

---

[1] Indeed, that principle has roots far older than the statute. *See, e.g., King v. McLean Asylum*, 64 F. 331, 333 (1st Cir. 1894) (a petitioner who "is not of unsound mind" such that he is capable of "self-control or self-care" and does not need hospitalization for treatment "is entitled to his liberty on the ground that restraint of him as an insane person anywhere cannot be authorized.").

If a person is committed, they typically end up in a federal or state mental hospital. *See* 18 U.S.C. § 4243(e). After that, they can petition every six months for release. *See* 18 U.S.C. § 4247(h).

### III. Discussion

Mr. Yeager does not present a substantial risk of danger, as the last three years have shown. When it comes to this area, case law isn't particularly helpful because each defendant is unique—it is the quintessential case-by-case problem. In predicting future dangerousness, courts consider the typical factors: the defendant's particular mental illness, his history, and the offense. The case law also reveals factors courts have found useful: (1) personal insight into their illness; and (2) amenability to treatment; (3) acceptance of responsibility; (4) social support; and (5) realistic future plans. *See, e.g.*, *U.S. v. McIntosh*, 900 F.3d 1301, 1306 (11th Cir. 2018) ("risk of [defendant] engaging in violence in the future was enhanced by his lack of insight and lack of amenability to treatment, as well as refusal to accept responsibility, lack of social support, and unrealistic future plans").[2]

Those factors all support Mr. Yeager, as addressed below:

---

[2] Predicting future dangerousness arises most often in the parole setting, but the idea is the same. *See, e.g.*, *Bankston v. Curry*, 2010 WL 1260199, at *2 (N.D. Cal. Mar. 30, 2010) (denying release where defendant "lack[ed] insight into his crime," and defendant wasn't amenable to treatment, participating in minimal "self-help or therapy").

*First*, Mr. Yeager sought help before and after the arson—on his own initiative. Two years before the arson, Mr. Yeager had been trying to seek disability benefits and addition help from the VA, but was receiving none. He didn't give up. Instead, he voluntarily sought help from a family friend, Dr. Barbara Fouts, a licensed psychologist. She diagnosed Mr. Yeager with PTSD, and described his symptoms of claustrophobia and sensory overstimulation. She wrote a letter that was specifically to help Mr. Yeager convince the VA to give Mr. Yeager the assistance he was seeking:

> **Dr. Barbara M. Fouts**
> Psychotherapy: Individual/Family/Child/Couples/Evaluations    Educational: Consultation/Advocacy/Testing
> Lic. Marriage, Family Child Therapist MF 21397 (CA)    15525 Pomerado Rd., Ste E4  Poway, Ca 92064
> Lic. Educational Psychologist EP 1657 (CA)    FAX (858) 486-4286
> dr.barb.fouts@gmail.com    cell (858) 395-0636
>
> December 31, 2018
>
> RE: Peter Yeager
> BD: 1975, 06,09
> SS: 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
>
> Mr. Yeager meets Diagnostic Criteria Post Trauma Stress Disorder. The trauma likely initially began with extreme sleep deprivation coupled with continual psychological assault during his initial entry into the Marine Corps. He was assigned a duty in which he was expected to be on duty up to 21 hours a day for several months. During that time, he was continually berated by the officer as not being adequate, good enough, never going to get out of the assignment. This instilled a debilitating sense of hopelessness and fear that the instigator may be correct, the experience may be accurate, and the situation would never end. Mr. Yeager continues to relive the experience during waking and sleeping. It became so stressful physically and psychologically that it led to his getting out of the Corps.

VA records from the same time show the same thing: Mr. Yeager continually seeking help—on his own initiative. He was denied for disability benefits in 2019.

Pete sought help because he wanted it. It was not his involvement in the federal criminal system that caused him to seek help. (If anything, it was the lack of help that

led him to the criminal system.) Indeed, in 2018 and 2019, Mr. Yeager was at times homeless and unable to stay in treatment—because he had been denied benefits.

After the arson, Mr. Yeager has shown extraordinary initiative in his own treatment:

(1) **Wounded Warrior Project.** He sought an obtained help through the Wounded Warrior project, which funded transcranial magnetic stimulation treatments at the Brain Treatment Center in Newport, California.[3] Critically, these treatments had a *lasting* effect.

(2) **Self-Referral to Psychologist**. In order to convince the VA to provide benefits, Mr. Yeager sought help from Dr. B. Scot Cook, Psy. D., whose diagnosis specifically notes that Mr. Yeager was "self-referred for a psychodiagnostic examination." Dr. Cook recommended that Mr. Yeager be granted VA disability benefits.

(3) **VA Treatment in Spokane, San Diego, and Portland**. Mr. Yeager obtained mental-health treatment from VA—entirely on his own—and has spent the last three years *continuously* maintain that treatment in three separate states.[4] Today, Mr. Yeager regularly sees a counselor through the VA.

---

[3] Defense counsel has the related medical records.

[4] Again, defense counsel has medical records.

(4) ***University of California, Qualcomm Institute Brain Study***. Mr. Yeager has voluntarily joined a research study conducted by a world-leading brain imagine institute (the UCSD, Qualcomm MEG Center).[5]

(5) ***Planned Brain Treatments***. In the last week, Mr. Yeager is pursuing transcranial magnetic stimulation (TMS) treatments through the Southern Oregon VA Rehabilitation Center and the Rogue Valley TMS Center (Medford, Oregon).

None of these things—not one—were pushed on Mr. Yeager by either defense counsel or a court. Defense counsel has never located treatment options for Mr. Yeager. (Although we have certainly applauded him.)

***Second***, even in the midst of his mental breakdown in 2020, Mr. Yeager wanted to protect people. Before the arson, as he sunk deeper into a mental breakdown, Mr. Yeager actually drew up a plan. It included a nonsensical "manifesto" (including, "The seat of Zeus is no longer in the Temple. Long Live the Republic!"). What is particularly interesting is that the first step is ensuring "all personal [sic] have been evacuated." Indeed, the "primary objective" is listed as, "The complete safety and survival of all parties involved." Those are Mr. Yeager's actual word: the primary objective was complete safety.

---

[5] *See* Univ. Calif. San Diego, Qualcomm MEG Centr. (https://bit.ly/3VkLJRS).

After the plan was complete, and the manifesto was published (via Twitter) and the building ignited, the plan included ensuring that "emergency services" would be "allotted safe space for structure protection to the surrounding buildings."

It might sound "sane" that Mr. Yeager had a written plan. It was not. The plan also included dancing the "Haka," a native Maori tribal dance made famous by the New Zealand All Blacks rugby team.

This plan wasn't the product of a rational mind. But even at his deepest moment of insanity, Mr. Yeager placed protecting people as the single highest goal.

***Third***, Dr. Cosby noted repeatedly commented about Mr. Yeager's insight into his own mental health and the offense: "He has practical insight into his mental condition and treatment needs."[6] He thinks deeply about his situation, mental health, and his future.

***Fourth***, Mr. Yeager continually demonstrates remorse and acceptance of responsibility. He actually asked Dr. Cosby "how he could apologize to the victims in court."[7] That is particularly remarkable given that Mr. Yeager, having been acquitted, could rightly *deny* responsibility and say, "hey, I was out of my mind—I'm not really

---

[6] *See* Cosby Rep. at 25; *see also* at 5 ("Mr. Yeager's response demonstrated self-reflection, insight, and depth."); at 15 ("I found him remarkably insightful and thoughtful").

[7] Cosby Rep. at 10.

responsible." Instead, he is deeply remorseful for the harm he caused even if he isn't legally responsible.

*Fifth*, Mr. Yeager has excellent social support and realistic future plans. The affidavits submitted tell the Court what it needs to know—he is close with supportive family and friends, speaking with them weekly. And he has realistic plans: Mr. Yeager has maintained housing and returned to school, completing an A.A. degree (with a 3.8 GPA) and completed a medical technician certificate.

*Sixth*, the Court needn't speculate as to Mr. Yeager's future risk—we know what it is. Unlike virtually every other insanity acquittee, Mr. Yeager was released during the pretrial period. During that time, nearly three years, Mr. Yeager violated no conditions and voluntarily went to mental-health treatment. We know without question what he will do—we have a three-year track record.

*Seventh*, civil commitment would achieve the opposite of what this Court hopes to achieve. Mr. Yeager is stable, connected to the VA and to treatment, has housing, and full support of family and friends. Removing him from that situation would actually harm him and provides no benefit to the public.

## IV. Conclusion

For the reasons above, Pete Yeager asks this Court to find him not a substantial risk of danger.

Dated: March 19, 2024.

Federal Defenders of Eastern Washington & Idaho
Attorneys for Peter Yeager

s/Colin G. Prince
Colin G. Prince, WSBA No. 43166
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
Colin_Prince@fd.org

### Service Certificate

I certify that on March 19, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorneys: Patrick Cashman.

s/Colin G. Prince
Colin G. Prince, WSBA No. 43166
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
Colin_Prince@fd.org